IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2014

**STATE OF TENNESSEE v. CHEYNE R. STEWART**

**Appeal from the Circuit Court for Franklin County**
**No. 19738     J. Curtis Smith, Judge**

---

**No. M2014-00074-CCA-R3-CD - Filed May 22, 2015**

---

The Defendant, Cheyne R. Stewart, was convicted by a Franklin County Circuit Court jury of criminal attempt to commit sexual battery, a Class A misdemeanor. *See* T.C.A. §§ 39-13-505(a)(3) (2014) (sexual battery), 39-12-101 (2014) (attempt). The trial court sentenced him to eleven months, twenty-nine days of probation. On appeal, he contends that (1) the evidence is insufficient to support his conviction, (2) the court erred by failing to provide his requested jury instructions, (3) the court erred by limiting defense counsel's questioning of character witnesses, (4) the court committed plain error by failing to instruct the jury on a lesser included offense, and (5) the court erred by failing to fulfill its duties as the thirteenth juror. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

B. Jeffery Harmon, District Public Defender; Kandi Nunley and Christina S. Gifford, Assistant Public Defenders (on appeal); and Jerry H. Summers and Marya L. Schalk (at trial), Chattanooga, Tennessee, for the appellant, Cheyne R. Stewart.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; J. Michael Taylor, District Attorney General; and Steven H. Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the Defendant's contact with the victim on the night of October 5, 2010. At the trial, the victim testified that she moved to Franklin County in July 2010. On the first night she was there, she met the Defendant through Jamie Knight, the victim's

mother's childhood friend, and went "four-wheeling" with him and his friends. The victim said that the Defendant never took her on a date but that they went four-wheeling a couple of more times with his friends and drank alcohol. In August, she twice had consensual sexual intercourse with him. Both times, they had been drinking alcohol. Once, she refused his request to engage in anal sex.

The victim testified that later in August, the Defendant asked her in a text message to have sex with him but that she declined. He asked her to tell the woman with whom she was living that she was going to the Sonic drive-in but to instead come to his apartment to have sex. The victim said she became angry and responded that he could not speak to her "like that" and that she was not "a booty call."

The victim testified that on October 5, 2010, she went to a political campaign headquarters in Winchester. The Defendant, Ms. Knight, and Jeff Kennedy, whom the victim also knew, were present. Around 8:30 or 9:00 p.m., the four of them and Ryan McKay went to a restaurant. The victim drank margaritas and sat between the Defendant and Ms. Knight. She remembered talking with the Defendant about his new cell phone but could not remember leaving the restaurant. She said she was not intoxicated.

The victim testified that her next memories were sitting on the Defendant's couch between him and Mr. Kennedy, becoming sick, and being in the Defendant's bed. She did not know if she was dressed when the Defendant placed a trash can in front of her. She next remembered waking. She did not remember having any consensual sexual encounter with the Defendant between the time she left the restaurant and when she awoke. She said she would not have agreed to have sex with him because she told him that she did not "want to have that kind of relationship with him [anymore]."

The victim testified that she woke up around 8:00 a.m. after Mr. Kennedy nudged her and said he "heard someone got drunk last night." She was undressed, under a sheet, and in the Defendant's bed. She did not remember undressing herself and said she felt "loopy" and was "freaking out." She said she drank too much on other occasions and experienced hangovers but did not have a hangover that morning.

The victim testified that she asked the Defendant why she was undressed. He responded that she had become sick and that he undressed her and put her in the shower. She

said that if she had been in a shower, she did not understand why her hair spray and her makeup were intact. The victim went to her car in the parking lot of the Defendant's apartment and called Ms. Knight to come and meet her there. She did not want to go back inside the apartment. She found one of her shoes behind her car but did not remember leaving it there. She vaguely remembered the Defendant's penetrating her anus but was uncertain of her memory.

The victim testified that after Ms. Knight arrived, Ms. Knight went inside to speak to the Defendant and that Ms. Knight and the victim then went home for the victim to shower. The victim said she noticed pain in her anal region and in the muscles used for urinating but did not feel any vaginal pain.

Ms. Knight and the victim decided to go to the hospital. Although the victim did not contact the police, the police appeared at the hospital. The victim was examined by a doctor and questioned, and a rape kit was administered. She took the bra and underwear she wore the previous night to Detective Andrea Davidson.

The victim testified that later that night, she gave a statement to Detective Davidson and, at her request, called both the Defendant and Mr. Kennedy but only reached Mr. Kennedy. The Defendant, however, sent a text message to the victim during the interview. In the message, he denied having sex with her but said he "fingered [her,] went down on [her,] and that's it." She did not remember any sexual contact with the Defendant or drinking or smoking anything after she left the restaurant.

On cross-examination, the victim testified that Ms. Knight and Mr. Kennedy, not the Defendant, provided margaritas to her. She said she did not know if she was intoxicated when she left the restaurant. She did not remember getting into her car or driving, but the next morning her car was at the Defendant's apartment.

The victim testified that she and the Defendant had never gone to his apartment during the day. She told Detective Davidson that she previously had intercourse with the Defendant but did not tell Detective Davidson that she previously performed consensual oral sex on the Defendant because she was not asked. She told Detective Davidson that she did not remember leaving the restaurant and that she drank from her roommate's and a friend's glasses.

-3-

The victim testified that during her phone conversation with Mr. Kennedy, she told him that she drank four margaritas the previous night and that she did not remember buying beer or smoking "any K2 or Spice or fake marijuana." She thought she had no memory due to the margaritas she drank. She said that the Defendant did not act improperly toward her on the night of the incident and that no one had told her otherwise.

The victim testified that she did not tell the Defendant's mother that he attacked her. She did not tell anyone other than Ms. Knight about the incident. She told people at the campaign headquarters that she had a stomach virus and could not work much.

The victim testified that the Defendant and Mr. Kennedy may have suggested some of the details of what happened when she asked them about that night. She had no memory of the incident. She did not remember kissing the Defendant or Mr. Kennedy, cuddling with the Defendant, "making out" with the Defendant, or telling hospital staff she was not coerced into whatever happened. She said she was upset the morning after because she was undressed. She said her jewelry had been removed. She said she took a shower upon arriving home.

The victim testified that she was told semen was found on her underwear but not around her anal or vaginal region. She acknowledged that she dated Ms. Knight's son and had been sexually intimate with him shortly before the incident.

On redirect examination, the victim testified that she drank some of the Defendant's beer at the restaurant but did not remember the circumstances of how she came to drink the beer. Whenever she saw the Defendant at the headquarters, she would not approach or speak to him because she did not want him to think she wanted a relationship. She was not frightened of him.

Jamie Knight testified that she had known the victim's mother since the first grade. The victim came to live with her in July 2010 and volunteered to work on the political campaign Ms. Knight managed. The Defendant, a city councilman, was also involved in the campaign.

Ms. Knight testified that in October, the victim, the Defendant, Mr. Kennedy, and Mr.

-4-

McKay went from the headquarters to the restaurant between 9:00 and 9:30 p.m. Everyone at the table drank alcohol, but no one was intoxicated. Ms. Knight went home about 10:30 p.m. When Ms. Knight left, the victim was sitting at the table with the Defendant. Ms. Knight did not observe anything unusual between the victim and the Defendant.

Ms. Knight testified that around 11:00 p.m., Mr. Kennedy called and sent her a text message asking if he could come to her house because he needed a place to sleep. He came over for about an hour. Ms. Knight did not know where he went afterward.

Ms. Knight testified that the victim called her the next morning between 7:00 and 8:00 and was upset and incoherent. The victim said she was at the Defendant's apartment, could not find her shoes, and did not feel "right." Ms. Knight told the victim to stay there and that she would come over.

Ms. Knight testified that when she arrived, the victim was sitting in her car and was distraught. Mr. Kennedy came outside, and one of the victim's shoes was found behind her car. Ms. Knight went into the Defendant's apartment and asked him where the other shoe was. The Defendant said he did not know. She said the Defendant would not "look [her] in the eye and speak." The Defendant went into a bedroom and came out with a blouse he thought belonged to the victim, but Ms. Knight told him it did not. Ms. Knight found the victim's earrings near the front door.

Ms. Knight testified that she and the victim went home and that the victim was upset and crying. She asked the victim if anything happened and if the Defendant touched her. The victim responded that she did not think the Defendant touched her. Ms. Knight asked if the victim had sex with the Defendant, and she said no. Ms. Knight told the victim to take a shower and meet Ms. Knight at the headquarters. While Ms. Knight was at the headquarters, the victim called. The victim was upset and said that the Defendant raped her anally and that she was in pain. The victim came to the headquarters. They talked about what happened the previous night, Ms. Knight called her doctor, and Ms. Knight took the victim to the hospital.

On cross-examination, Ms. Knight testified that she could not remember if she told Detective Davidson that the victim said her stomach bothered her. She said Mr. Kennedy bought a pitcher of margaritas and poured the victim a glass, but Ms. Knight did not buy

alcohol for the victim. The Defendant also slid his tall glass of beer to the victim.

On redirect examination, Ms. Knight testified that the Defendant saw the victim's Facebook page before meeting her and that a photograph on the page showed a tattoo on her lower back. The Defendant noticed the victim's tattoo and commented that women with this type of tattoo were willing to engage in anal intercourse.

Franklin County Sheriff's Department Detective Andrea Davidson testified that on October 6, 2010, she was notified of a possible sexual assault and went to the hospital to see the victim. She collected the victim's vaginal swabs from the rape kit. The victim gave the clothing she wore during the incident to Detective Davidson. Detective Davidson sent the clothing, along with the victim's blood sample, to the Tennessee Bureau of Investigation (TBI) laboratory. After being informed that DNA was found, Detective Davidson sent the bra and underwear worn by the victim during the incident and the Defendant's and Mr. Kennedy's DNA samples to LabCorp.

Detective Davidson testified that the victim told her that she had sex with the Defendant during a four-wheeling trip. At Detective Davidson's request, the victim called Mr. Kennedy from the police department. During the recorded phone conversation, a transcript of which was read to the jury, the victim told Mr. Kennedy that she was still "kind of weirded out" by the morning's events and wanted to know if the Defendant was with Mr. Kennedy. Mr. Kennedy responded that the Defendant was not with him. The victim asked what happened the previous night. Mr. Kennedy responded that they were at "a Mexico restaurant," that they bought and drank beer and smoked K2, that they drove back to the Defendant's apartment, drank about one beer each, and smoked a roll of K2, and that she then began cuddling with the Defendant. He said the victim was "hanging on" and "making out" with the Defendant. He said that after a while, he did not want to listen to them talk, so he called Ms. Knight, asked if he could "crash there," and went to her house. An hour later, around midnight, the Defendant sent Mr. Kennedy a text message saying that he should return because the victim was vomiting. Mr. Kennedy did not read the message until the next morning.

In the recording, the victim told Mr. Kennedy that she remembered sitting on the couch next to him and the Defendant while the television was on and getting sick. She did not, however, remember leaving the restaurant and kissing or touching the Defendant because that was something she would not do. Mr. Kennedy responded that the Defendant

said that he took off her clothes and put her in the shower and that there was evidence at the apartment she had vomited.

In the recording, the victim told Mr. Kennedy that she smoked K2 once a long time ago. Mr. Kennedy responded that was probably the reason why she could not remember much and that K2 could "f--- you up." He did not see anyone give her "anything."

In the recording, when the victim told Mr. Kennedy that she could tell something had happened, he responded that she should confront the Defendant. She responded that she had called the Defendant but that he was not answering because he knew what he had done to her. She said Ms. Knight sent the Defendant a text message that morning and told him that the victim was in a lot of pain. The Defendant responded that the victim had been intoxicated and had vomited.

In the recording, the victim told Mr. Kennedy that she did not think the Defendant penetrated her vaginally but that she thought he went "around the other thing." She said that she had never been touched like that previously and that she was in a lot of pain, which was how she knew the Defendant had done something to her. Mr. Kennedy responded that she needed to speak to the Defendant and that Mr. Kennedy would speak to him. He said, "I didn't know it was going to go down like that. I thought it was just going to be fine. I'm sorry."

In the recording, the victim told Mr. Kennedy that the Defendant had "tried" to have sex with her previously and that she told him that she did not want more than a friendship. She asked Mr. Kennedy if he saw the Defendant put her in the shower, and Mr. Kennedy said he had already left. She responded that she did not think the Defendant put her in the shower because her hair spray was intact and because he took off everything, including her jewelry. She also said she did not know how her shoe got behind her car, and Mr. Kennedy responded that it might have fallen off when they drove her car to buy beer. He said he would speak to the Defendant because Mr. Kennedy thought that the Defendant was lying and that maybe the Defendant did "mess around" with her.

Detective Davidson read to the jury text messages obtained from the Defendant's and Mr. Kennedy's cell phones. On October 6, 2010, at 1:23 a.m., the Defendant wrote to Mr. Kennedy that he should "come on back" and that "she got to puking." A minute later, the

Defendant wrote, "S[---] didn't work and plus i thought we was gonna tag team da hoe[.]" At 9:09 p.m., he accused Mr. Kennedy of telling people in Knoxville that the Defendant raped a girl when it was not true.

Detective Davidson testified that at 9:20 p.m., after the victim and Mr. Kennedy's recorded phone conversation, the Defendant sent the victim the following series of text messages:

> I don t knee w what y think happened last night but we did not have sex you started making out w me in front of jeff then after awhile of that he left . . . O nd we went into my bedroom and continued making out were we got naked and i figure you and went down on you and somewhere between Me goin down on you . . . you stop me and start talking bout you and kyle havig something and u didn t know who h wanted to be w and then between telling me about kyl you pike in . . . u hand an on u attemtijg yo get to the toliet that s when i helped u take a shower and put u back in bed w a thrash can and few mind later u start pukin . . . again i left and went to bed leaving u pukin and talkn bout kyle i said f[---] and went to bed and that was it and i m done talkin w you because u are [accusing] me if something that did not happen[.]

Detective Davidson testified that she interviewed Mr. Kennedy in February 2011. The recording of Mr. Kennedy's statement was played for the jury. In the statement, Mr. Kennedy agreed he, the Defendant, the victim, Ms. Knight, and "Brian" went to the restaurant and drank margaritas. He, the Defendant, and the victim stayed at the restaurant for a long time and all left together. They then went to the Defendant's apartment, but Mr. Kennedy could not remember when they arrived. He said he had not been at the Defendant's apartment long when he and the victim left for the gas station, where he bought beer. When they returned to the Defendant's apartment, the victim sat between the Defendant and Mr. Kennedy on the couch, and they drank beer and smoked K2.

In Mr. Kennedy's statement, he said that around 1:00 or 2:00 a.m., he asked Ms. Knight if he could "crash" at her house. He said that he left the Defendant's apartment because Mr. Kennedy assumed the Defendant and the victim were going to have consensual sex. He stayed at Ms. Knight's house until morning and then returned to the Defendant's apartment. The Defendant was preparing to go to work, and the victim was still in bed. Mr. Kennedy could not remember if the victim was undressed or if Ms. Knight came to pick her

up, although he remembered the victim's looking upset and leaving before he left.

On cross-examination, Detective Davidson testified that she did not know before the trial that the victim performed oral sex on the Defendant during a four-wheeling trip and did not remember if the victim said at the hospital that the victim never had sex with him. She told the previous prosecutor that the victim told her that the Defendant and the victim had intercourse in August 2010 at a friend's house. The victim said that Mr. Kennedy and Andrew Rose were present, that it was the only time she and the Defendant had sex, that it occurred after he insisted, and that afterward he consistently attempted to convince her to meet him for sex. Detective Davidson never spoke to Mr. McKay about the case, never interviewed anyone at the gas station about the victim and Mr. Kennedy's visit on the night of the incident, and never determined if the station had surveillance cameras.

Detective Davidson testified that LabCorp reported that the DNA on the victim's clothing was a mixture consistent with the DNA of at least two males and that Mr. Kennedy was excluded as a contributor. Detective Davidson knew the victim had sex with Ms. Knight's son within "the past hours and days." She placed the bra and underwear worn by the victim during the incident in one bag and said that two items placed in the same bag could result in cross-contamination.

Detective Davidson testified that she was unaware if Ms. Knight bought the victim drinks. In her affidavits, Detective Davidson wrote that the victim remembered drinking from Ms. Knight's margarita and one of the male's margaritas, that the victim stayed with the Defendant at the restaurant, that the Defendant told the victim to drink the rest of his beer, and that the victim did. The victim told Detective Davidson that the victim had no memory of driving to the Defendant's apartment.

TBI Special Agent Bradley Everett, an expert in serology and DNA testing, testified that he analyzed the evidence in this case. He found the presence of semen on the crotch area of the victim's underwear. Agent Everett said he did not perform a DNA analysis because it was unlikely he would have been able to obtain a DNA profile using the TBI's traditional STR DNA techniques.

On cross-examination, Agent Everett testified that he took cuttings from the crotch area of the underwear where the semen was found. He said DNA could get onto underwear from

various forms of sexual contact, including anal sex.

LabCorp Analyst Dwayne Winston, an expert in forensic science, testified that he performed Y-STR DNA testing on the victim's bra and underwear and that he found the Y chromosome DNA profiles represented a mixture of DNA from more than one male. The Defendant could not be excluded as the major contributor to the DNA on the bra or underwear. Regarding the Y chromosome DNA profile on the underwear, he said one in every twenty-four males had the same DNA profile. Based upon this percentage, Mr. Winston concluded that the Defendant could have been a contributor. Mr. Winston said that Mr. Kennedy's DNA was analyzed and that Mr. Kennedy was excluded as a contributor to the DNA found on the bra and underwear.

On cross-examination, Mr. Winston testified that LabCorp received the bra and underwear in the same bag. He said separating the items into individuals bags would have eliminated the possibility of cross-contamination.

The parties stipulated that a TBI analysis of the victim's blood found no "basic drugs" and a blood alcohol level of 0.01. The parties stipulated that NMS Labs tested the victim's blood sample for the presence of K2 but found none.

Dr. Dyrk Halstead, an expert in emergency medicine, testified that he examined and interviewed the victim at the hospital. The victim said that the incident occurred around midnight, that she was unsure if penetration occurred, and that she did not know if the alleged assailant was injured. The victim remembered being at the assailant's apartment, vomiting, waking up undressed in bed, dressing herself, collecting her jewelry, going home, and noticing rectal pain. Dr. Halstead said that the victim was able to answer his questions and that the history she provided to him and to the nurse was consistent.

Dr. Halstead testified that the victim rated her pain as five out of ten. He said anal penetration could cause pain. He did not find any tearing, bruising, or other physical injury. He could not exclude the possibility that the victim was penetrated anally.

Dr. Halstead testified that the victim said she drank tequila and had no memory of the previous night. He said the memory loss could have been consistent with the ingestion of

alcohol or narcotics.

Dr. Halstead testified that he obtained vaginal and anal swabs from the victim. The hospital did not test for K2 or "date-rape" drugs. The hospital only performed basic drug screenings, which were negative.

On cross-examination, Dr. Halstead testified that the victim said no coercion was used and no consensual sex occurred in the last seventy-two hours. She also said she drank tequila but did not remember any other substances. Dr. Halstead testified that typically, signs of injury would be present if a person who did not regularly have anal sex were assaulted without consent or lubrication.

On redirect examination, he testified that the victim's complaint of perianal pain could be consistent with anal penetration and that he prescribed her pain medication. He said she sometimes became emotional when trying to remember events. He also said her being upset was consistent with a sexual assault.

Ryan McKay testified that he, the victim, and Ms. Knight were at the restaurant on the night of the incident. He drank one beer and was unaware of what the Defendant drank. Ms. Knight bought the victim margaritas. Mr. McKay did not go to the Defendant's apartment or purchase beer or K2 for the victim. He thought she was becoming intoxicated at the restaurant.

Andrew Rose testified that in the summer of 2010, he, the Defendant, the victim, and Mr. Kennedy were at a lake house. He walked to the lake and saw the Defendant with the topless victim facing and straddling him in the water. He thought they were having sex. Later that evening, he saw the Defendant seated on a daybed in the house with the topless victim facing and straddling him. It appeared they were having sex.

Connie Murray testified that she knew Ms. Knight and that her reputation in the community for truth and veracity was "bad." Ms. Murray said that when Ms. Knight took the victim to the hospital, Ms. Knight told Ms. Murray that the Defendant was "going to pay for this." On cross-examination, Ms. Murray testified that the Defendant and his family were her friends and that she did not want him to go to jail.

Larry Phillips testified that he knew Ms. Knight and that her reputation in the community for truth and veracity was poor.

Yvonne Stewart, the Defendant's mother, testified that she was at the headquarters on the day after the incident and that she saw the victim, who did not mention the incident. On cross-examination, Ms. Stewart testified that she learned from Ms. Knight that the victim had been to the hospital, that Ms. Stewart asked the victim what was wrong, and that the victim responded that she had a stomach virus and would be fine.

Before instructing the jury, the trial court merged four counts into two. Count six (aggravated sexual battery based upon bodily injury) was merged with count three (aggravated rape based upon bodily injury), and count ten (sexual battery based upon mental incapacity or physical helplessness) was merged with count seven (rape based upon mental defect, mental incapacity, or physical helplessness). The court then instructed the jury on one count of aggravated rape based upon bodily injury and one count of rape based upon mental incapacity, mental defect, or physical helplessness. The jury found the Defendant guilty of one count of the lesser included offense of attempted sexual battery based upon mental defect, mental incapacity, or physical helplessness. This appeal followed.

## I. Sufficiency of the Evidence

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the

conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant here, sexual battery is "unlawful sexual contact with a victim by the defendant . . . [and] . . . [t]he defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless[.]" T.C.A. § 39-13-505(a)(3). "Sexual contact" is defined, in relevant part, as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id*. § 39-13-501(6) (2014). "Intimate parts" include, in relevant part, "the primary genital area, [or] buttock . . . of a human being[.]" *Id*. at (2). "Mentally incapacitated" describes a person who "is rendered temporarily incapable of appraising or controlling the person's conduct due to the influence of a narcotic, anesthetic or other substance administered to that person without the person's consent, or due to any other act committed upon that person without the person's consent[.]" *Id*. at (4). "Physically helpless" describes a person who "is unconscious, asleep or for any other reason physically or verbally unable to communicate unwillingness to do an act[.]" *Id*. at (5).

Criminal attempt occurs, in pertinent part, when

> [a] person . . . acting with the kind of culpability otherwise required for the offense: . . . (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a)(3). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." *Id*. at (b). "It is no defense to prosecution for criminal attempt that the offense attempted was actually committed." *Id*. at (c).

Viewing the evidence in the light most favorable to the State, the record reflects that the victim met the Defendant in July 2010. Before the incident, they engaged in consensual sexual activity on at least two occasions, but the victim told the Defendant on several

occasions that she did not want to continue a sexual relationship.

On the night of the incident, the Defendant, the victim, and others went to a restaurant. The victim and the Defendant drank alcohol, some of which was provided to the victim by the Defendant. Later, she, the Defendant, and Mr. Kennedy went to the Defendant's apartment. The victim and Mr. Kennedy left to go to a gas station, where they bought beer and K2, which the victim consumed. Sometime after 11:00 p.m., Mr. Kennedy left the apartment.

The next morning, the victim awoke undressed and in the Defendant's bed. Even though the Defendant said he undressed her and put her in the shower, her hair and makeup were intact. The victim did not remember any sexual contact or consenting to any sexual activity, and she did not remember undressing herself. She was unsure whether the Defendant penetrated her anally. Later that morning, the victim noticed pain in her anal region while using the bathroom.

Testing of biological material found on the victim's underwear and bra worn during the incident revealed a mixture of DNA from more than one male contributor. The Defendant could not be excluded as the major contributor to the DNA.

The Defendant admitted in a text message that he digitally penetrated the victim. The Defendant also sent a text message to Mr. Kennedy on the night of the incident, which read "S[---] didn't work and plus i thought we was gonna tag team da hoe[.]" From this evidence, we conclude that the jury could have found that the Defendant attempted to penetrate the victim's anal opening without her consent while she was physically helpless for the purpose of sexual arousal or gratification. The evidence is sufficient.

## II. Requested Jury Instructions

The Defendant contends that the trial court erred by failing to provide his requested jury instructions on the illegality of K2 and the inadequacy of the police investigation. According to his brief, the K2 instruction would have clarified to the jury that K2 was illegal at the time of the incident, and the police investigation instruction would have informed the jury that they could consider the inadequacy of the investigation in determining whether the

State met its burden of proof or whether non-obtained evidence would have been favorable to him. Regarding the K2 instruction, the State responds that he waived the issue by failing to include a copy of the request in the record and that it was immaterial to the question of consent because no K2 was found in the victim's blood. Regarding the police investigation instruction, the State responds that the instruction was unsupported by the law or the proof. We conclude that the issue is waived.

Tennessee Rule of Appellate Procedure 24(a) requires appellants to include in the record "any requests for instructions submitted to the trial judge for consideration, whether expressly acted upon or not." *See also* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The record reflects that the Defendant referred to jury instruction requests he filed regarding the illegality of K2 and the inadequacy of the police investigation during the trial, in his memorandum in support of motion for new trial, at the motion for new trial hearing, and in his brief but did not include a copy of the filed requests in the appellate record. Therefore, consideration of the issue is waived.

### III. Questioning of Character Witnesses

The Defendant contends that the trial court erred by limiting his questioning of Ms. Murray and Mr. Phillips, the character witnesses. He argues he should have been allowed to ask whether based upon their "personal knowledge," they would have believed the testimony of Ms. Knight in a court of law. He also argues that although no offer of proof was made as to the witnesses' answers, their answers would have been apparent from the context. *See* Tenn. R. Evid. 103(a)(2). The State responds that he was allowed to question the witnesses regarding Ms. Knight's reputation for truth in the community and that he was not prejudiced by the omission of the proposed question because she did not witness the incident. We conclude that the Defendant was not prejudiced by any omission and that consideration of the issue with respect to Mr. Phillips is waived.

Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). Tennessee Rule of Evidence 608 allows the credibility of a witness to be attacked or supported in the form of an opinion or reputation as to the witness's character for truthfulness

or untruthfulness. Tenn. R. Evid. 608(a). Under the pre-608(a) rule, a character witness could be asked if he or she knew the general reputation of another witness "whose credibility [was] in question," what the general reputation was, and whether based upon that knowledge, the character witness would believe the other witness under oath. *Gilliam v. State*, 38 Tenn. 38, 39 (1858) (citing *Ford v. Ford*, 26 Tenn. 92, 101 (1846)); *State v. Joseph A. Knickerbocker*, No. 100, 1986 WL 2307, at *5-6 (Tenn. Crim. App. Feb. 19, 1986). When evidence has been excluded, an offer of proof of "the substance of the evidence and the specific evidentiary basis supporting admission" must either be made or be apparent from the context. Tenn. R. Evid. 103(a)(2).

Relative to Mr. Phillips, the record reflects that defense counsel only attempted to ask Ms. Murray, not Mr. Phillips, the proposed question. Consideration of whether defense counsel should have been allowed to ask Mr. Phillips this question is, therefore, waived. Relative to Ms. Murray, the record reflects that defense counsel did not lay the proper foundation for opinion testimony based upon personal knowledge, *see, e.g., State v. Dutton*, 896 S.W.2d 114, 118 (Tenn. 1995), and that the trial court sustained an objection to defense counsel's asking Ms. Murray whether she would believe Ms. Knight's testimony under oath based upon her reputation in the community for truth and veracity. Because Ms. Murray testified that Ms. Knight's reputation for truth and veracity in the community was poor, the jury could have reasonably inferred she would not have believed Ms. Knight's testimony. Further, we note the Defendant concedes in his brief that Ms. Murray's answer would have been apparent to the jury. Because the Defendant made no offer of proof to contradict the inference, any alleged error was harmless. Relief on this basis is denied.

## IV. Lesser Included Offense

The Defendant contends that the trial court committed plain error by failing to instruct the jury on assault by offensive touching as a lesser included offense of rape. *See* T.C.A. § 39-13-101(a)(3) (2014). He concedes that he did not file a written request for the assault instruction but argues that the State requested multiple lesser included offense instructions, including assault, and that he did not object. The State responds that the Defendant waived the issue for tactical reasons because the instruction would have been inconsistent with his defense strategy of consent.

When a party fails to make a written request for a lesser included offense instruction, a trial court may still instruct a jury on the offense. *Calvin Eugene Bryant v. State*, —S.W.3d

-16-

—, —, 2015 WL 1137755, at *6 (Tenn. Mar. 13, 2015). A party, however, is "not entitled to such an instruction." *Id*. In order for an appellate court to grant plain error relief,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994); *see State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). All five factors must be shown. *Smith,* 24 S.W.3d at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

Under current law, "the trial judge shall instruct the jury as to the law of each offense . . . that is a lesser included offense of *the offense charged in the indictment or presentment.*" T.C.A. § 40-18-110(a) (2012) (emphasis added). For all offenses committed on or after July 1, 2009, the Code defines a lesser included offense, in relevant part, as an offense for which "[a]ll of its statutory elements are included within the statutory elements of the offense charged." *Id.* at (f)(1); *see State v. David Lynn Harrison*, No. E2008-01082-CCA-R3-CD, 2010 WL 3238309, at *10 (Tenn. Crim. App. Aug. 17, 2010). We note that although the Defendant cites to *State v. David Gene Hooper*, No. E2004-01053-CCA-R3-CD, 2005 WL 1981789, at *14 (Tenn. Crim. App. Aug. 16, 2005), to support his contention, that decision was based upon prior law.

The record reflects that the Defendant was indicted for rape based upon the victim's mental defect, mental incapacity, or physical helplessness. *See* T.C.A. § 39-13-503(a)(3) (2014). Assault by offensive touching occurs when a defendant "[i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." *Id*. § 39-13-101(a)(3). Our supreme court has concluded relative to plain error review that "omission of an instruction on a lesser included offense does not result in the breach of a clear and unequivocal rule of law when the status of the crime as a lesser included offense is not apparent based on prior law[.]" *State v. Broderick Devonte Fayne*, — S.W.3d —, —, No. W2012-01488-SC-R11-CD, 2014 WL

-17-

5430049, at *8 (Tenn. Oct. 27, 2014).

Although the Defendant cites to *David Gene Hooper* to support his contention that the trial court should have instructed the jury on assault by offensive touching as a lesser included offense, the Defendant's emphasis on *Hooper* is misplaced because this court relied on part (b)(2) of the analysis delineated in *State v. Burns*, 6 S.W.3d 453, 466-67 (Tenn. 1999). Our inquiry focuses on whether assault is a lesser included offense of rape pursuant to Code section 40-18-110(f)(1) because it was in effect at the time of the offense. *See David Lynn Harrison*, 2010 WL 3238309, at *10. In this context, the Defendant cites to no legal authority supporting his contention that assault is a lesser included offense of rape, and no current legal authority supports his contention. As a result, the Defendant has failed to show that a clear and unequivocal rule of law was breached. *See Smith*, 24 S.W.3d at 282; *see also Adkisson*, 899 S.W.2d at 641-42. We conclude that the court did not commit plain error by failing to instruct the jury on assault by offensive touching as a lesser included offense of rape.

### V. Thirteenth Juror

The Defendant contends that the trial court erred by failing to fulfill its duties as the thirteenth juror. The State responds that the court approved the jury's verdict when it overruled his motions for a judgment of acquittal and a new trial. We agree with the State.

Tennessee Rule of Criminal Procedure 33(d) embodies the thirteenth juror rule and allows a trial court to "grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d); *see State v. Moats,* 906 S.W.2d 431, 434 (Tenn. 1995). Our supreme court has explained that

> [a] new trial will be required after appeal, only when the record contains statements indicating that the trial court failed to act as the thirteenth juror or misconstrued its authority under that rule. When a trial court simply overrules a motion for new trial without comment, an appellate court will presume that the trial court approved the verdict as the thirteenth juror.

*Moats*, 906 S.W.2d at 435 (citing *State v. Carter,* 896 S.W.2d 119, 120-22 (Tenn. 1995)).

-18-

The record reflects that the trial court denied the Defendant's motions for a judgment of acquittal and a new trial.  The Defendant argues the court incorrectly denied the motion for a judgment of acquittal based upon the contradiction of the State's proof by the defense proof.  "[T]he accuracy of a trial court's thirteenth juror determination," however, "is not a subject of appellate review." *Id*. (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).  We have also determined that there is sufficient evidence to support the conviction.  Therefore, we conclude that the trial court exercised and fulfilled its duties as the thirteenth juror when it overruled the motion for a new trial.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE